IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

TIMOTHY CLIFTON,
        Plaintiff,

v.                                          Case No. 5:10cv154/RS/CJK

MICHAEL J. ASTRUE,
Commissioner of Social Security,
        Defendant.

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Northern District of Florida Local Rules 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v.  The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for  disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-83.

## PROCEDURAL HISTORY

Plaintiff (Mr. Timothy Clifton, who will be referred to by name, as plaintiff, or as claimant)  protectively filed his applications for benefits on January 31, 2006.

T. 23, 121-29.[1]  They were denied initially and on reconsideration.  T. 23, 72-79, 82-94.   After a hearing, an administrative law judge ("ALJ") issued a decision on October 22, 2008, finding that plaintiff was not disabled under the Social Security Act at any time through the date of her decision.  T. 23-33.  The Appeals Council of the Social Security Administration denied plaintiff's request for review on April 15, 2010, rendering the ALJ's decision the final decision of the Commissioner.  T. 1-3.

In the present action for review of the Commissioner's decision , Mr. Clifton raises two issues (as stated in his memorandum) (doc. 16):

1)      Although at least three physicians, including Dr. J. Walter Jacobs, Ph.D., Dr. David J. Smith, Ph.D., and Dr. Suzanne Zoss, Ph.D., diagnosed the plaintiff with Major Depressive Disorder and Anxiety Disorder producing restrictions in his ability to function, the ALJ did not even consider his mental impairments to be severe.

2)      While the ALJ references the medical evidence of record in the Decision, this reference presents a bias favorable to the Commissioner by omitting portions favorable to the plaintiff or misrepresenting statements by the health care professionals.[2]

## FINDINGS OF THE ALJ

In his written decision the ALJ made several findings relative to the issues raised in this appeal:

---

[1] The administrative record, as filed by the Commissioner, consists of nine volumes (doc. 12-1 through 12-9), and has 541 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

[2]Plaintiff's memorandum identifies these two issues for review, but the argument section of the memorandum states only one issue, apparently collapsing the two issues initially identified into one "omnibus" issue concerning the ALJ's handling of the psychological evidence.

1)   Claimant has not engaged in substantial gainful activity since December 21, 2005, the alleged onset date.

2)   Claimant has the following severe impairments:  degenerative disc disease of the cervical and lumbar spine, post traumatic arthritis of the right elbow, and right shoulder impingement.

3)   Claimant's medically determinable mental disorders of depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

4)   Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)   Claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except claimant can only occasionally climb, balance, kneel, crouch, crawl, and reach overhead with his right (non-dominant) arm.  He must avoid working at heights, including activities that require climbing ladders, scaffolds, or related implements.  The ALJ found that claimant's medically determinable impairments could reasonably be expected to produce his alleged symptoms; however his statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the ALJ's assessed residual functional capacity.

6)   Claimant is unable to perform his past relevant work, but, based upon his residual functional capacity, age, education, and work experience, is able to perform jobs that exist in significant numbers in the national economy.

Accordingly, the ALJ found plaintiff has not been under a disability, as defined by the Act, since the date he filed his application.  T. 9-33.

STANDARD OF REVIEW

"Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards."  *Olds v. Astrue*, No. 5:09cv319/RS/EMT, 2011 WL 691595, at *1 (N.D. Fla. Jan. 19, 2011); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").  Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(1)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512. "If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Olds*, 2011 WL 691595, at *2. "If the Commissioner carries this burden, the claimant must then prove [she] cannot perform the work suggested by the Commissioner." *Id.*

FACT BACKGROUND AND MEDICAL HISTORY[3]

Plaintiff suffered an industrial accident in 2000, resulting in a workers' compensation claim and an award of a closed period of Social Security disability. The accident occurred when Mr. Clifton touched an electric wire and fell from an eight-foot ladder.  T. 507.  He returned to work in 2002, but has not worked since early 2004.   In the disability application, when asked what injuries, illnesses, or conditions limit his ability to work, plaintiff responded, "Smashed right arm, cervical bulging discs, bone spurs in spine, impingement in right shoulder, anxiety, lower back pain which causes legs to hurt, left arm is starting to swell."  T. 155.

On June 13, 2000, Mr. Clifton underwent surgeries by Dr. Greg Cook, Franklin Orthopaedics and Sports Medicine, in Tennessee.   Plaintiff had repair of a comminuted, displaced fracture of the right distal radius humerus, with incision and drainage of wound, and ulnar nerve transposition at the right elbow.  T. 344.  After a year, plaintiff had some improvement, but still had pain as well as some loss of flexion and extension.  T. 343.  By an office visit with Dr. Cook in October 2001, plaintiff had some aching pain at night, minimal swelling over the hand, and fairly good range of motion.  X-rays showed good placement of the fixating screw, and a basically congruent articular surface.  T. 335.  Plaintiff had reached maximum medical improvement several months before, and Dr. Cook expected slow progress in plaintiff's activities.  T. 335.  Some aching will persist for life.  T. 335.  At his last office visit with Dr. Cook, in August 2002, plaintiff still had lost range of motion with no gross instability or significant swelling.  He had some atrophy around the

---

[3] Although intended to be thorough, and to provide an overview of plaintiff's history of care and treatment, this synopsis of medical evidence will be supplemented as called for in the Analysis section.

right elbow.  X-rays showed nicely healed fractures, with no evidence of bone spurs or other significant changes.  T. 334.

Beginning in February 2004, Mr. Clifton sought care at Lynnville Medical Clinic (also referred to as Lewisberg Medical Clinic) in Tennessee.  T. 258-76.  A cervical spine x-ray of February 10, 2004, showed mild joint hypertrophy, and mild narrowing of the disc spaces, leading to an impression of mild degenerative changes. T. 290.  An x-ray of May 25, 2004, revealed some arthritis in the right elbow joint without acute fracture or dislocation.  T. 289.  He was diagnosed with neck, shoulder, and elbow pain, as well as depression.  T. 269.  The clinic appears to have provided anaesthetic injections.  T. 265-69.

On May 5, 2004, plaintiff admitted himself to Bay Medical Behavioral Health Center in Panama City.  T. 251-55.  He stated he had a nervous breakdown, and wanted to kill himself.  T. 252.  An examination by Dr. Ira Weiner produced an assessment of adjustment disorder, generalized anxiety disorder, and social anxiety disorder. T. 253.  He was discharged the next day with a referral to Life Management Center.  T. 251.

Upon referral from Dr. Charles Sidberry, plaintiff sought treatment from Dr. Ata Ul Moshin, Comprehensive Pain Medicine, Panama City.  T. 314-29.  Dr. Ul Moshin performed an initial assessment and diagnosed neck pain with degenerative disc disease, low back pain, and chronic use of narcotic medications.  T. 329. Plaintiff was able to sit, stand, and walk without assistance.  He had antalgic gait (an indication of pain with weight-bearing).  He had decreased range of motion in the neck and lower back, especially at forward flexion and backward extension.  The straight leg raising test was positive on both sides.  T. 327.  Dr. Ul Moshin believed plaintiff had chronic neck pain, chronic low back pain, and right shoulder pain.  T.

323.  On October 20, 2005, Comprehensive Pain Medicine administered six trigger point injections in the neck and shoulder region.  T. 316-17.  On November 11, 2005, Mr. Clifton reported relief from these injections.  T. 313.  Dr. Ul Moshin discussed long term pain management.   Shortly thereafter, a cervical MRI showed disc degeneration throughout the cervical spine with spondylosis at multiple levels in the cervical spine.  The study showed mild spinal canal stenosis at C5-6, secondary to spondylosis and bulging disc material.  T. 331.

On March 23, 2006, plaintiff self-referred to Southern Orthopedic Specialists in Panama City, reporting right arm pain.  X-rays ordered that day revealed severe arthritis of the radial capitular joint along with olecranon humeral joint, of the right elbow.  T. 362-64.  Plaintiff also reported neck pain.  Southern Orthopedic recommended further treatment.  T. 362.  Soon afterward, plaintiff had a right shoulder injection, but Dr. Williams, who performed the procedure, felt he might require further surgery–arthroplasty with a fascia graft–or even a total elbow replacement, a procedure for which the doctor thought plaintiff too young to undergo. T. 360.

On October 17, 2006, plaintiff underwent right elbow arthroscopy with removal of loose body and debridement.  The procedure was performed by Dr. Orvis Chitwood of Dothan, Alabama, under general anesthesia.  T. 435.  The arthroscopy revealed a large amount of scar tissue.  On October 30, 2006, Dr. Chitwood planned to continue pain medication and work on range of motion.  T. 433.  The Occupational Medicine Division of Dr. Chitwood's practice reported on December 4, 2007, that plaintiff could work in the light physical demands classification, but also reported that the testing was possibly invalid due to plaintiff's poor effort, resulting in inconsistent

test results.  The Functional Capacity Evaluation report stated, "His overall attitude and actions were not indicative [of] someone in level of pain."  T. 496-97.

Also on referral from Dr. Chitwood, plaintiff began care at Southeast Pain Management Center, Dr. David Evans, in July 2008.  T. 507-27.  Dr. Evans diagnosed pain in upper arm and shoulder with advanced post-traumatic arthritis in the right elbow.  T. 511.  In September 2008, Mr. Clifton returned for follow up.  In the interim, he had fallen at home and broken his hand.  T. 521.  A urinalysis was inconsistent for his prescribed medications of Tramadol and Darvocet, and positive for THC.  T. 525.  Also, in the interim, Dr. Evans had referred plaintiff for psychological assessment.  Dr. Evans felt no return to Southeast Pain Management was indicated.  Also, based on the drug testing, invalid Functional Capacity Evaluation, and "significantly aberrant psychometric testing," Dr. Evans had no recommendations for chronic pain medication or interventions.  T. 526.

On August 20, 2008, plaintiff saw Walter Jacobs, Ph.D., on referral from Dr. Evans, for a psychological evaluation.  T. 528-31.  The Pain Patient Profile compared Mr. Clifton to a normative sample of average pain patients.  He described himself as much more depressed and anxious than the average pain patient.  Such a level of emotional distress would severely hamper pain treatment.  The somatization score suggested a preoccupation with physical symptoms that are multiple and magnified.  Dr. Jacobs diagnosed pain disorder, major depression, panic disorder, and nicotine dependence.  Psychological tests were "extremely pathological."  T. 530.  Dr. Jacobs felt that "given the severity of his emotional distress, Mr. Clifton would probably be best served by psychiatric management."  T. 531.  At a minimum, he should be on antidepressant medication.  He would also benefit from individual counseling designed to help him cope more effectively with pain and emotional distress.  T. 531.

In conjunction with his disability application, Mr. Clifton underwent several psychological evaluations.  David Smith, Ph.D., performed such an evaluation on July 13, 2006.  T. 369-71.  Plaintiff evidenced numerous pain behaviors.  Dr. Smith diagnosed moderately severe anxiety and depression, causing moderate impairment of social functioning, and mild barriers to daily living activities.  T. 371.

Dr. Suzanne K. Zoss diagnosed depressive disorder and anxiety disorder, with dependent traits.  T. 376-83.  Dr. Zoss produced a Psychiatric Review Technique showing moderate restrictions and difficulties in activities of daily living and in maintaining social functioning.   She reported mild difficulty in maintaining concentration, persistence, or pace.  T. 384.  Dr. Zoss also completed a Mental Residual Functional Capacity Assessment that showed moderate limitation in a range of categories relating to sustained concentration and persistence, but noted no significant limitation in other such categories.  T. 388-90.  Plaintiff would be moderately limited in four of five categories relating to social interaction, including ability to interact appropriately with members of the public, ability to get along with coworkers or peers, and ability to maintain socially appropriate behavior.  T. 389. Dr. Zoss concluded that plaintiff can perform simple repetitive tasks on a sustained basis within his physical limitations and would do best in work that does not require extensive interaction with others.  T. 390.

On October 26, 2006, Cheryl Woodson, Psy.D., performed a psychological review.  T. 418-31.  Dr. Woodson diagnosed moderately severe depression and anxiety disorder with dependent traits, and felt these would be "mild barriers to daily living."  T. 431.

On August 18, 2006, Dr. Du Nguyen completed a Physical Residual Functional Capacity Assessment.  T. 392-99.  This report established exertional limitations including occasional lifting of 20 pounds, frequent lifting of 10 pounds, ability to stand or walk about 6 hours in an 8-hour workday, and ability to sit about 6 hours in an 8-hour workday.  The examiner found Mr. Clifton's statements on pain and limitation "partly credible" but did not elaborate upon that conclusion.  T. 397.

On December, 7, 2006, Dr. Karen Kuhns performed another Physical Residual Functional Capacity Assessment.  T. 445-52.  This examination noted the October arthroscopy.  Noted exertional limitations were essentially the same as those found by Dr. Nguyen.  T. 446.

<u>HEARING BEFORE THE ALJ</u>

Plaintiff Timothy Clifton was 44 years old on the day he appeared for his hearing.  He has a high school education and worked in the field of commercial air conditioning until January 2004.  In June 2000, he sustained a work-related injury to his right arm.  T. 42-43.  He received a lump sum workers' compensation settlement in 2001, and was able to return to work after that.  Plaintiff left work in 2004 because of issues with his right arm and his back.  He testified he is unable to return to work due to chronic pain and lack of mobility.  In particular, he has the most pain in the low back, right elbow, right shoulder, and right hand.  T. 46.  He describes his pain as level eight on a scale of one to ten, and although it comes and goes is always present to some extent.  T. 48.  Plaintiff also said he has pain in his upper back, with bone spurs.  T. 48.  He has been told the only treatment remaining for his arm is a right elbow replacement.  T. 50.  According to his hearing testimony, he can barely lift even 5 pounds with his right arm.  T. 50.

In addition to the arm and back, plaintiff has been told he has "severe anxiety, depression, and stress." T. 51. Plaintiff testified he has one to three anxiety attacks a week. T. 54. He plans to follow up on these issues with a psychiatrist, but at the time of hearing had not yet seen the doctor. T. 52.

Upon examination by the ALJ, plaintiff noted he has medical insurance through his girlfriend's work policy. T. 56. He smokes about two packs of cigarettes a day. T. 57. He no longer had a primary care doctor, took no medications at the time, and had one medical appointment scheduled, that being with the psychiatrist. T. 59. As for activities, he enjoys coon hunting, but "can't hardly get out and do that anymore." T. 60. Specifically, he can only hunt every two weeks or so, when someone will drive him. T. 61. He cares for his four coon dogs, but not for his girlfriend's chickens. T. 61.

The ALJ called Robert Bradley to give vocational testimony. T. 63-68. In response to hypothetical questions, Mr. Bradley said plaintiff's physical limitations would rule out the type of work he did before his injury. T. 64. Roberts was able to identify a number of light duty and sedentary jobs within plaintiff's physical limitations. T. 64-67. Although the ALJ modified her hypotheticals to take into account a number of limitations, the one question pertaining to emotional limitations posited "an individual . . . limited in terms of interaction with the public during the workday to no more than occasional." T. 68. This limitation would have eliminated two of the jobs previously identified.[4] T. 68.

_____

[4]Significant to the analysis below, this non-exertional limitation, although included in a vocational hypothetical, did not ultimately become part of the residual functional capacity, as formulated by the ALJ. T. 29; Report and Recommendation at 3, *ante*. In any event, as this Report and Recommendation will suggest, it is not at all clear that this limitation would have

<u>ANALYSIS</u>

As earlier noted, plaintiff has collapsed his argument into one encompassing issue he believes supports reversal or remand. It appears to me that he has done this because his second issue is simply an argument that the ALJ did not properly consider the reports and opinions of the evaluating mental health professionals, which, in turn, led the ALJ to consider the mental impairments as nonsevere. The ALJ did not ultimately include the mental impairments in her assessment of residual functional capacity.

The ALJ found that plaintiff's "medically determinable impairments of depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in claimant's ability to perform basic mental work activities and are therefore nonsevere." T. 11. Plaintiff argues this was error, based upon the totality of the psychological evidence. The Commissioner responds by arguing that the ALJ properly evaluated plaintiff's credibility and subjective allegations. Doc. 20, p. 5. Plaintiff relies upon Social Security Ruling 96-6p, directing that the findings of agency consultants and other program physicians and psychologists "must be treated as expert opinion evidence of non-examining sources." Doc. 16, p. 22. He also relies upon 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2) (stating that ALJs "must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether [claimant is] disabled"). He cites no other regulations or case law to support his argument. The

accounted for all of plaintiff's emotional impairments.

initial question thus becomes whether the ALJ's characterization of mental impairments and her assessment of residual functional capacity are supported by the evidence of record.  *See Carnes*, 936 F.2d at 1218.

Plaintiff's thrust is that the findings of Dr. Smith (consultant), Dr. Zoss (state agency consultant), and Dr. Jacobs compel a finding that his depression and anxiety were at least severe level impairments.  In dismissing the mental impairments, the ALJ found plaintiff had "mild" limitation in activities of daily living, social functioning, concentration, persistence, or pace, and no episodes of decompensation. T. 11-12.  In establishing residual functional capacity, the ALJ commented briefly on the reports of Dr. Smith and Dr. Cheryl Woodson.  T. 14.  The ALJ does not, however, seem to have taken into account the totality of the psychological record, and seems to have regarded little, if at all, the opinions of Dr. Zoss and Dr. Jacobs.  As to Dr. Jacobs' report, the ALJ gleaned only that "claimant was likely to magnify and exaggerate his symptoms for secondary gain and that it was unlikely he would fully and actively participate in a treatment plan." T. 15.  Respectfully, and as set out just below, this is not a fair synopsis of Dr. Jacobs' findings and recommendations.

Although Dr. Smith did diagnose some moderate impairments, he believed these would be only mild barriers to daily living activities.  Dr. Smith also found the mental health symptoms to be moderate barriers to social functioning, with guarded prognosis.  T. 371.  Dr. Zoss diagnosed depression, anxiety, and dependent traits, which she concluded would cause moderate restriction of activities of daily living and ability to maintain social functioning.  T. 385.

Dr. Jacobs, who saw plaintiff on referral from a treating physician, diagnosed major depression, recurrent, moderate to severe.  T. 530.  According to Dr. Jacobs'

report, plaintiff had a valid and very pathological profile.  Among ten clinical scales, there were eight high elevations, with seven of those extreme.   The depression scale was extremely elevated.  Anxiety was very high.  Plaintiff probably experiences panic attacks.  According to the Harris Lingoes subscales, plaintiff is experiencing family conflict and "has a profound sense of alienization."  T. 529.  The paranoia scale was extremely high, indicating Mr. Clifton is suspicious and distrustful of practically everyone.  "His distrust may reach irrational proportion."  T. 529.  He is among those patients "with the greatest number of symptoms, the most severe symptoms and the poorest prognosis."  T. 529.   The Patient Pain Profile suggests Mr. Clifton is "obsessively worried, nervous, anxious and agitated."  T. 530.  "Other people are likely to view Mr. Clifton as self centered, reactive, demanding, pessimistic and complaining."  T. 530.  Dr. Jacobs believes plaintiff needs psychiatric management. T. 531.

        The ALJ said that Dr. Woodson had characterized plaintiff's mental condition as nonsevere, and causing no more than mild mental limitations.  Read in full, Dr. Woodson's report notes that plaintiff had moderately severe depression and anxiety, but these would be only "mild barriers" to daily living.  T. 431.  She excused his self admission to a mental hospital in 2004 as "due to an altercation with his girlfriend's mother."  T. 431.   She did not mention that upon admission to Bay Medical Behavioral, plaintiff had said he broke down and wanted to kill himself because, "My girlfriend's mother says mean stuff to me."  T. 252.  One might be tempted to grapple with the seeming paradox of a man with only mild limitations in daily living and social functioning, while at the same time checking himself into a mental hospital because his girlfriend's mother was "mean" to him.

At step two of the sequential analysis, 20 C.F.R. § 404.1520(a)-(g), the ALJ must determine whether the claimant has a severe impairment that keeps him from performing his past work.  20 C.F.R. § 1520(c).  The burden at this step is on the claimant.  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir. 1986).  As to "severe impairment," the Commissioner's regulations provide:

> What we mean by an impairment(s) that is not severe.
>
> (a) Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.
>
> (b) Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include–
>
> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work situations;  and
>
> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521.  The Commissioner has adopted an interpretive ruling that specifically addresses how to determine whether medical impairments are severe. The ruling provides in part:

As explained in 20 C.F.R. §§ 404.1520, 404.1521, 416.920(c), and 416.921, at the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful activity]. An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). Thus, even if an individual were of advanced age, had minimal education, and a limited work experience, an impairment found to be not severe would not prevent him or her from engaging in SGA.

SSR 85-28, 1985 WL 56856, at *3 (1985).

Upon review of the evidence, I conclude that substantial evidence does not support the ALJ's finding at step two that Mr. Clifton's mental impairments were not severe. The evidence showed that these impairments did, in fact, cause restrictions in daily living, social functioning, and maintaining concentration, persistence, or pace. The evidence will not support a conclusion of only "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work . . . ." *See id.* "An impairment is not severe only

if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.  Claimant need show only that her impairment is not so slight and its effect is not so minimal." *McDaniel v. Bowen*, 800 F. 2d 1026, 1031 (11th Cir. 1986).  Here, Mr. Clifton carried his burden at step two of showing severe mental impairments.

I must next determine whether remand is necessary.  Unfortunately, plaintiff's memorandum, although advancing his claim that the mental impairments are severe, devotes not a line to the question of whether this shortcoming has resulted in prejudice to him.  "Step two is a threshold inquiry."  *Id*.  Under this step of the sequential analysis, only the most trivial claims will be rejected.  *Id*.  Because step two is a threshold inquiry, and simply allows the ALJ to proceed to the next step, which the ALJ did in this case, any error as to the mental impairments must be examined under a harmless error standard.  *See Delia v. Comm'r of Soc. Sec.*, No. 10–15092, 2011 WL 2748622, at *1 (11th Cir. July 14, 2011) ("Because the ALJ gave full consideration to the consequences of Delia's mental impairments on his ability to work at later stages of the analysis, the error at step two was harmless and is not cause for reversal.").

Here, step two was resolved in plaintiff's favor when the ALJ identified a number of severe impairments–degenerative disc disease of the cervical and lumbar spine, post-traumatic arthritis of the right elbow, and right shoulder impingement. Plaintiff does not argue that his mental impairment meets a listed impairment, so as to end the inquiry at step three.  Instead, he implicitly argues that the ALJ failed to properly account for the mental impairments in determining residual functional

capacity.  I draw this inference because in his Conclusion, plaintiff asks for a remand in order for the ALJ to properly evaluate mental impairments and determine what effect these impairments have on his ability to work.  Doc. 16, p. 25.  Without recognizing the harmless error standard, plaintiff asks for a reformulation of his residual functional capacity, which is the step five inquiry.  If the ALJ has already sufficiently accounted for the mental impairments at step five, however, no remand is called for.

An erroneous finding as to "severe" impairments at step two may improperly foreclose a claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities."  *Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985).   Considering that the ALJ here did not include any mental impairments in her formulation of residual functional capacity, the same can be said as to that step in the analysis.  This is so because impairments must be evaluated in combination at all stages of the analysis.  *See Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990); *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); 20 C.F.R. §§ 404.1523 and 416.923.  Impairments must be evaluated in combination even though some impairments are not severe.  *See Hudson v. Heckler*, 755 F.2d 781, 785 and n.2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled."  *Davis*, 985 F.2d at 534.

On the other hand, even if there is error at step two, a remand is not needed if the error is harmless.  The error is harmless if the ALJ has considered the limiting effects of the impairment at each succeeding step, along with other impairments.  *See*

*Reed–Goss v. Astrue*, 291 F. App'x 100, 101 (9th Cir. 2008); *Riepen v. Comm'r of Soc. Sec.*, 198 F. App'x 414, 415 (6th Cir. 2006); *Newton v. Astrue*, No. 1:06-CV-1542-AJB, 2008 WL 915923, at *10 (N.D. Ga. Apr. 1, 2008).

Under the foregoing standard, I must determine whether the step two error has foreclosed plaintiff's ability to demonstrate the merits of his claim, and whether the ALJ has, on account of the error, failed to properly evaluate plaintiff's impairments in combination. The ALJ made the following statements in the course of the step four analysis of residual functional capacity:

In July of 2006, the claimant underwent a consultative psychological examination conducted by David Smith, Ph.D., a licensed psychologist. After conducting his examination Dr. Smith diagnosed the claimant with depressive disorder NOS, and anxiety disorder NOS, with dependant traits. He opined that due to his depressive and anxiety symptoms coupled with maladaptive dependant traits, the claimant had only mild barriers to activities of daily living and noted that the claimant was able to care for his dogs, perform housecleaning, and cook. Dr. Smith indicated that the claimant had moderate barriers to social functioning, based on his reports that people got on his nerves and that he avoided social functions as well as the fact that he was observed to be irritable and moody. Dr. Smith indicated that the claimant was capable of managing his own funds and assessed a GAF score of 60 which would be indicative of mild to moderate difficulties (Exhibit 10F). This same month State agency psychological consultant Cheryl Woodson, Psy.D., evaluated the claimant's mental condition utilizing

the recognized psychiatric review technique.  Her opinion was that the claimant's mental impairment was nonsevere and that he had no more than mild mental limitations (Exhibit 15F)[.]

. . . .

In regards to his psychological issues, the claimant alleged that he had been diagnosed with severe anxiety, stress, and depression by a psychiatrist at pain management and that he had been ordered to undergo therapy.  He testified that he had appointments scheduled with a psychiatrist in the future.  He claimed that he experienced anxiety attacks one to three times per week depending on what his circumstances are and alleged that they lasted all day on occasion. When asked how his anxiety affected him, the claimant indicated that it made him want to stay isolated in his house.

. . . .

As for the claimant's alleged mental symptoms, while Dr. Jacobs did note the claimant complained of symptoms consistent with severe anxiety, he also noted that the claimant was likely to exaggerate his symptoms.  The independent consultative report prepared by Dr. Smith indicated that the claimant had minimal mental limitations, and the claimant's testimony as to his living situation and relationships tends to suggest even less social limitation [than] that noted by Dr. Smith. Overall the evidence of record would support the assessment of Dr. Woodson.

T. 28, 29, 30.

The ALJ assigned a residual functional capacity of light work, with certain limitations, none of which relate to plaintiff's mental impairments. T. 26-27. I conclude that the step two error in this case did prejudice plaintiff. The residual functional capacity analysis mentions emotional limitations, but only to the extent of discounting them. As a result, a combination of limitations that includes plaintiff's depression, anxiety disorder, and dependent traits disorder has not been properly considered. "[A]n ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled." *Davis*, 985 F. 2d at 534. "[I]t is certain that mental and psychological defects can combine with physical impairments to create total disability to perform gainful employment." *Bowen v. Heckler*, 748 F.2d 629, 634 (11th Cir. 1984).

The ALJ either mischaracterized, or partially recognized, the evidence of mental and emotional impairment. The actual differences among most of the various psychological examiners is not great. Although the ALJ relied upon the summary conclusions of Dr. Cheryl Woodson, her report is in fairly stark contrast to that of the numerous other examiners. She found the same disorders, but concluded with little or no explanation that any limitation would be mild. Such conclusions, particularly in light of the detailed findings of Dr. Jacobs, fall short when they are viewed as essentially the only substantial evidence to support the ALJ. *See Perales*, 402 U.S. at 401 (defining substantial evidence as "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion'" (quoting *Consolidated Edison Co.*, 305 U.S. at 217)). The ALJ's statement that Dr. Woodson's conclusions are substantiated by the overall evidence of record is not persuasive, and I do not accept it.

The error is not, therefore, harmless.  Having, for all practical effect, completely rejected the emotional impairments, the ALJ formulated a residual functional capacity that did not take into account such impairments.  Accordingly, Mr. Clifton's combined impairments, and their effect on his ability to perform work, were not considered.  The general rule in Social Security cases where error such as I have noted here is to reverse and remand for additional proceedings.  *See, e.g.*, *Davis*, 985 F.2d at 534.  My recommendation for reversal is based upon my conclusion that the ALJ did not properly weigh all of the evidence in the record. Plaintiff asks in his prayer for relief that the case be remanded for proper consideration of the emotional impairments.  The controlling statute provides, "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  Thus, remand for further proceedings is appropriate.

Upon the foregoing, it is respectfully RECOMMENDED that the decision of the Commissioner be REVERSED, and that this action be REMANDED to the Commissioner for further proceedings consistent with this report.

At Pensacola, Florida, this 29th day of August, 2011.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).